# In the United States Court of Federal Claims

No. 12-380C
(Filed Under Seal: August 29, 2018 | Reissued: September 12, 2018)[*]

| | |
|---|---|
| UNITED LAUNCH SERVICES, LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Keywords: Motion for Summary Judgment; Breach of Contract; Affirmative Defense; Advance Agreement; Cost Accounting Standards; GAAP.

*Carl J. Nichols*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Plaintiff. *Christopher E. Babbitt*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., *Karen L. Manos*, Gibson, Dunn & Crutcher LLP, Washington, D.C., and *Matthew J. Thome*, von Briesen & Roper, s.c., Milwaukee, WI, Of Counsel.

*Corrine A. Niosi*, Senior Trial Counsel, and *David M. Kerr*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant, with whom were *Patricia M. McCarthy*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General.

## OPINION AND ORDER

**KAPLAN, Judge.**

Since 1998, Plaintiff The Boeing Company (Boeing), along with its successor-in-interest, Plaintiff United Launch Services (ULS), has contracted with the United States Air Force to provide rocket launch services for the government using Boeing's Delta IV launch vehicle.[1] In this action, Boeing asserts that the government has breached certain agreements it entered in 2006 and 2008, when the parties restructured Boeing's Delta IV launch contracts. The agreements in question concern the government's obligation to make payments related to two sets of costs that Boeing incurred prior to 2006. For accounting purposes, Boeing had deferred

---

[*] This opinion was previously issued under seal on August 29, 2018. The parties were given the opportunity to propose redactions on or before September 12, 2018. Because the parties have notified the Court that they do not have any proposed redactions (ECF No. 137), the Court resissues its decision without redactions.

[1] The Court refers to Boeing and ULS collectively as "Boeing" throughout this opinion.

these costs when it incurred them for allocation to anticipated future launches by holding them in inventory as an asset.

The government asserts that these agreements cannot be enforced because they are contrary to the government's cost accounting standards (CAS), which apply to the restructured contracts, and to the FAR. This claim centers on a contention that the accounting practices Boeing employed in deferring the costs were required to, but did not, comply with generally accepted accounting principles and practices (GAAP).

Boeing has now moved for summary judgment on its breach-of-contract claims. The government, for its part, contends that summary judgment is inappropriate because factual disputes exist regarding whether deferring the costs complied with GAAP and thus whether they are lawfully payable under the restructured contracts. For the reasons discussed below, the Court agrees with the government. Accordingly, Boeing's motion for summary judgment is **DENIED**.

## BACKGROUND[2]

## I.     Initiation of the EELV Program and Early Acquisition History

### A.     <u>Historical Context</u>

Since the advent of the space age, the United States has consistently viewed access to space as a key strategic objective, and has long partnered with private industry to develop the launch vehicles needed to attain space access. See Ray A. Williamson, <u>Access to Space: Steps to the Saturn V</u>, in <u>Exploring the Unknown Vol IV: Accessing Space</u> 6–10 (John M. Logsdon ed., 1999), https://history.nasa.gov/SP-4407/vol4/cover.pdf. The origins of the dispute in this case can be traced back to 1994, when, in an update to the National Space Transportation Policy, the president called for "the improvement and evolution of the current U.S. expendable launch vehicle (ELV) fleet." White House Office of Science and Technology Policy, <u>Fact Sheet – Statement on National Space Transportation Policy</u> (Aug. 5, 1994), https://clintonwhitehouse3. archives.gov/WH/EOP/OSTP/other/launchstfs.html. In particular, the president directed "the DoD, in cooperation with the civil and commercial sector," to "evolve satellite, payload, and launch vehicle designs to achieve the most cost-effective and affordable integrated satellite, payload, and launch vehicle combination." <u>Id.</u>

Over the next several years, the Air Force developed and implemented an acquisition strategy for the so-called "evolved" expendable launch vehicle (EELV) program. See App. in Supp. of Pls.' Mot. for Summ. J. (PA) at 598 (Dec. 1, 2017). The acquisition unfolded in several phases. See <u>id.</u> at 604–05. As relevant here, by 1998, a pre-development demonstration phase had been completed, and two contractors—Boeing and Lockheed Martin—had demonstrated the viability of their EELV concepts to the Air Force's satisfaction. See <u>id.</u> at 606.

---

[2] The facts set forth below are based on the attachments to the parties' briefs and the undisputed portions of Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on Counts I and II of Supplemental Complaint (Pls.' SUMF), ECF No. 118. Where a factual dispute exists, it is noted.

### B.      The 1998 Contracts/Agreements

In 1998, the Air Force settled on a two-pronged approach for the EELV procurement. See id. at 606–07. First, using its "Other Transaction (OT) authority," the Air Force would enter into development agreements with Boeing and Lockheed Martin, under which they would be awarded "not more than $500M" to support the "development of a launch capability."[3] Id. at 606, 614–15. Second, under FAR Part 12, the Air Force would award each contractor an initial launch services (ILS) contract on a firm fixed-price basis "to satisfy specified [government] launch needs from 2002 through 2005."[4] Id. at 607.

At the time, the parties expected that the government would be but "one of many customers" to whom the contractors would sell launch services "in the highly competitive, lucrative world market." Id. at 606 (anticipating that government launches would "constitut[e] perhaps 30% of each contractor's customer base"); see also Pls.' SUMF ¶¶ 6–11. Thus, in the Air Force's estimation, the $500 million up-front development award, coupled with the fixed-in-advance prices for government launches, would "permit[] an equitable and sensible allocation of program risk between the Government and the contractor[s]." PA 617. Further, this approach would tolerate some "accounting flexibility" in meeting the government's launch needs, as neither the OT agreements nor the ILS contracts would be subject to the government's CAS. See id. at 615–17.

## II.     Boeing's Performance on the Development Agreement and the ILS Contract

### A.      Agreement and Contract Execution

On October 16, 1998, Boeing and the Air Force executed the development agreement and the ILS Contract. Pls.' SUMF ¶ 13. Boeing's EELV would be known as the "Delta IV" launcher.[5] See id. ¶ 8. Boeing was awarded nineteen government launches on the ILS contract, along with two contingent launches. Id. ¶ 13; see also PA 712. At the time, Boeing expected that "[c]ommercial markets w[ould] exhibit strong growth" and estimated that it would perform more than 390 Delta IV launches by 2020. PA 556, 581; see also Pls.' SUMF ¶ 8.

### B.      Boeing's Practice of "Lot Accounting"

Upon the award of the development agreement and ILS contract, Boeing adopted a so-called "lot accounting" method to "account[] for [the] hardware production costs" it would incur

---

[3] "When an agency uses its other transactions authority, it need not comply with the procurement statutes [or] the FAR," but it still must "comply with any other statute that applies to contractual transactions in general." John Cibinic, Jr. et al., Formation of Government Contracts 21 (4th ed. 2011); see also 10 U.S.C. § 2371(a) (granting OT authority to "[t]he Secretary of Defense and the Secretary of each military department").

[4] FAR Part 12 governs the acquisition of commercial items.

[5] Lockheed Martin's EELV launcher, in turn, would be known as the "Atlas V." See Pls.' SUMF ¶ 2.

in producing the Delta IV launchers. Pls.' SUMF ¶ 37. As described below, the purpose of adopting this accounting practice was to "average" the costs Boeing incurred in the course of making a certain number of launchers across all the missions required to consume those launchers. Id.

Boeing elected to use this average-costing approach because it expected that it would incur larger costs towards the start of the ILS contract, when it was standing up its production facilities and "learning" how to build the launchers. See PA 1247; PA 1647; DA 897. By contrast, it believed that later launchers would be less expensive to build. See PA 1647. Thus, by averaging costs across the lot, Boeing expected to smooth out the ebb and flow of the costs it would incur. See id.; see also DA 983.

Boeing's implementation of this accounting practice proved to be fairly complex. It began by identifying eighteen major hardware end-items that would be used, in various configurations, in any given Delta IV launcher. See PA 1781 (slide deck presentation describing lot accounting); see also id. at 764 (internal Boeing program memo identifying the 18 end items); Pls.' SUMF ¶ 38. It then defined a "production lot"—known as "Lot 1"—that would consist of a certain quantity of each of the eighteen end items.[6] Pls.' SUMF ¶ 37.

Further, and of particular importance to this case, Boeing incurred common support costs, traceable to certain kinds of direct labor, as it produced Lot 1's major end items. See PA 1647. Boeing classified these costs as "program management" and "hardware support" (PM&HS) costs.[7] See id.; see also Pls.' SUMF ¶ 38. Boeing included these common costs in Lot 1 and treated them as though they were separate end items. See DA 981.

Under Boeing's lot accounting practice, the company did not realize the costs incurred to produce the Lot 1 end items (including the PM&HS costs) as liabilities on its balance sheet at the time they were incurred. See Pls.' SUMF ¶¶ 41–42. Rather, Boeing classified the costs as an asset in the form of work-in-progress (WIP) inventory.[8] See id. ¶¶ 41–49.

---

[6] The government disputes that Boeing initially defined the lot by reference to quantities of end items, and asserts instead that it began by defining the lot in terms of a certain number of launchers. See Def.'s Resp. to Pls.' Statement of Undisputed Material Facts in Supp. of Their Mot. for Summ. J. on Counts I & II of Suppl. Compl. (Def.'s SUMF Resp.) at 12–13, ECF No. 126.

[7] Program management costs included labor costs for "such activities as Program Office, Business Management, Supply, and certain Engineering Labor." PA 1647; see also DA 982. Hardware support costs consisted of costs such as "Quality" and "Support Labor" costs at Boeing's Decatur, AL factory and its Huntington Beach, CA operations center. PA 1647; see also DA 982.

[8] Thus, as an accounting matter, when it incurred costs, Boeing recorded the conversion of one asset (i.e., cash on hand) to another asset (inventory). Because of this, the parties and the Court occasionally refer to these costs as "inventoried" costs or expenses.

Later, Boeing realized the costs as liabilities on a "mission-by-mission basis" when missions were launched. See Pls.' SUMF ¶ 50. Specifically, for each mission, it would tally the proportional costs associated with the end items used in that mission's launch vehicle (including a proportional measure of the PM&HS costs); add in other costs associated with that mission to arrive at a "cost of sale"; and match the cost of the sale (a liability) against the revenue received for the mission.[9] Pls.' SUMF ¶¶ 50–54; see also PA 764–65 (draft program review memorandum describing proportional distribution of costs).

### C.   Boeing Faces Challenges As the Commercial Launch Market Fails to Take Off

In the early 2000s, the robust and lucrative commercial launch market of the parties' projections failed to materialize. Pls.' SUMF ¶ 15 ("[I]t . . . became clear that there were few commercial customers for EELV launch services."); see also PA 770 (market analysis from September 2002 describing the market as "soft"). As a result, by June 2003, Boeing essentially pulled the Delta IV off the commercial market, and made a downward adjustment to the number of Delta IV launches it believed would take place by 2020. Pls.' SUMF ¶ 17; see also PA 862–64 (decreasing projected commercial launches through 2020 from 162 to 25, and overall launches from 369 to 201).

As a result of this downward adjustment, the period of time required to consume Lot 1's end items now stretched well beyond Boeing's initial projections. See PA 1001–02 (2004 analysis projecting that Lot 1's end items would not be consumed until 2010, nearly a decade later than first expected). Further, because of the dearth of commercial opportunities, most of Lot 1's end items would be devoted to government contracts—for which Boeing had already fixed prices under the ILS contract.[10] See id. at 786–88.

---

[9] The Court notes that because launches would begin (and Boeing would thus realize costs) before Boeing had incurred all the costs to complete the lot, Boeing had to compute "average" costs for launches before it knew (1) the actual total costs to complete the lot, and (2) the total number of missions that would be required to use all of the lot's end items. To do so, it relied on an estimated cost at completion (EAC), which it divided by the projected number of missions to calculate average costs. See Pls.' SUMF ¶ 54; see also PA 1646–48 (describing how the "average cost to be assigned . . . to individual units" depended on "the total cost estimate[] to complete the units in the lot," and how the proportion of the PM&HS costs assigned to a mission depended on the number of projected missions); DA 898, 977. Boeing asserts that, as it incurred additional costs after its early launches, it "adjusted the cost of sales charged for launched missions on a quarterly basis to reflect updated EACs for those missions." Pls.' SUMF ¶ 54.

[10] Thus, had Boeing booked two commercial launches for every government launch, only about one-third of Lot 1's end items would have been used for government launches. But with few commercial launches on the horizon, nearly all of Lot 1's end items would be used in government launches. See PA 868–70 (describing this effect and observing that Boeing expected that it would have to find a way to adjust the prices of its government missions upward).

These changes, however, had no effect on the cost to complete the items in Lot 1; and, in fact, Lot 1's EAC drifted upward over time, contravening (at least in part) Boeing's assumption that the later-in-time end items would be cheaper to produce due to efficiencies from learning. See, e.g., id. at 773–76 (noting quarterly EAC growth of $285.1 million from 2002 Q2 to 2002 Q3); see also id. at 1752. This combination of circumstances led Boeing to record significant losses on its "definitized" contracts in the second quarter of 2003.[11] Id. at 775–76, 786–89; see also Pls.' SUMF ¶¶ 19–20.

Then, in March 2003, the Air Force informed Boeing of an investigation into whether it had committed a Program Integrity Act (PIA) violation in the course of bidding on the ILS contract in 1998. DA 121–23; see also PA 1001. As a result of the investigation, the Air Force ultimately transferred seven ILS contract launches away from Boeing and suspended Boeing from participation in further launch procurements for a time.[12] See DA 123–24; see also PA 1001, 1120. Thus, by mid-2004, Boeing had again adjusted its manifest downward, to 117 launches by 2020. See PA 916–18; id. at 1001–02.

## III.   The Air Force Decides to Restructure the EELV Contracts

### A.   The 2005 Update to U.S. Space Transportation Policy

In a January 6, 2005 update to the nation's space transportation policy, the president acknowledged that the "significant downturn in the market for commercial launch services ha[d] undermined . . . the ability of industry to recoup its significant investment in current launch systems." Id. at 1077. Thus, "[t]o assure access to space" going forward, the government would have to "provide sufficient and stable funding for [the] acquisition of U.S. space transportation capabilities." Id.

### B.   The Air Force's Revised Acquisition Policy

On March 10, 2005, the Air Force distributed a revised EELV acquisition strategy intended to implement the updated space transportation policy. Id. at 1114–27. The Air Force's stated goal was to achieve "assured access to space" in a manner that "allows the contractors viability, yet holds them accountable for past business decisions." Id. at 1117.

To achieve these aims, the Air Force resolved to award "two . . . contracts for each [launch] provider under FAR Part 15." Id. at 1124. The first would be "a cost reimbursable-type award fee contract for launch capability." Id. The second would be a "firm fixed price contract with a[] M[ission] S[uccess] I[ncentive] for the launch services." Id.

---

[11] When it recorded these losses, Boeing defined a "definitized" contract as "a signed and legally binding contract." PA 786. Further, it "consider[ed] priced options that [we]re probable of being exercised to be definitized contracts," and stated that "Lot #1 consist[ed] of 36 launches[,] of which 24 [we]re definitized." Id. at 786, 788.

[12] The Air Force lifted the suspension on March 4, 2005. PA 1120. It is unclear whether Boeing booked any additional losses as a result of this penalty.

Under this approach, the launch capability contract would provide the contractors with an assured stream of funding to devote to ongoing expenses such as "[l]aunch infrastructure elements"; "prime and supplier critical skills retentions"; "factory [and] engineering support"; and "program management." See id. at 1124–25. Meanwhile, under the launch services contract, the government would pay separately for specific mission needs, including "launch hardware (core vehicle and upper stage)" and "mission hardware (payload fairing, payload adapter/attach fitting, mission unique hardware build)." See id. at 1124.

Importantly, under this contract structure, when Boeing incurred new costs of the type it had characterized as PM&HS costs under the ILS contract, such costs would be reimbursable under the launch capability contract, not the launch services contract. See Pls.' SUMF ¶ 60.

Further, in the acquisition policy, the Air Force announced that "[l]osses incurred under the 1998 OTA and ILS contracts . . . w[ould] not be recoverable under" the restructured contracts. PA 1125; see also id. (government intended to "maintain the contractors' loss position on previous awards"). And because the new contracts would be governed by FAR Part 15, the government would also gain "significantly more insight/oversight into the contractors' management, technical, cost[,] and schedule performance," not least because the government's CAS would apply. See id. at 1121; see also id. at 2019. In particular, the Air Force specified that it would "review . . . [the] contractors' investments and costs . . . prior to contract award" and make a "determination of what contract costs can be recovered in compliance with the OTA and ILS contracts and current CAS." Id. at 1127.

## IV.   Boeing's Proposals and DCAA's First Audits

### A.   Initial Proposals and Definition of DSC Costs

Pursuant to the revised acquisition policy, the Air Force issued RFPs for the new EELV launch capability (ELC) and EELV launch services (ELS) contracts in April 2005. Pls.' SUMF ¶ 66. Boeing submitted its initial proposals on June 20, 2005. Id. ¶ 67.

In preparing its proposals, Boeing realized that after the restructuring, the types of costs it had characterized as PM&HS costs would fall under the rubric of the ELC contract, not the ELS contract. See id. ¶ 60; see also PA 1649; DA 982. Boeing's inventoried costs, however, included PM&HS costs that it had already incurred and associated with anticipated future missions. See Pls.' SUMF ¶ 61; see also PA 2021–22. The parties refer to these costs as "deferred support costs," or "DSC." Pls.' SUMF ¶ 62. Boeing had expected to recover these costs (or realize losses on them) on its launch services contracts, and those launches would now take place during the period covered by the ELC contract. See Pls.' SUMF ¶ 61; see also PA 2021–22.

To ensure that it could recover the inventoried DSC costs on the ELC contract, Boeing "sought an advance agreement providing that it would continue to use lot accounting, except for certain costs that had been accumulated in inventory [i.e., the DSC costs], which Boeing proposed to recover by charging directly to final cost objectives of the ELC contract."[13] Id. ¶ 67

_____

[13] "Advance agreements may be entered into between the government and a contractor prior to the incurrence of the costs involved in a contract and serve to express the parties' understanding

(quotation and alteration omitted); see also PA 1247–48, 1258–59 (bid excerpts detailing proposed advance agreements).[14]

## B. DCAA's First Pre-Negotiation Audits

After Boeing submitted its proposals, the parties began a long and complicated negotiation process. See Pls.' SUMF ¶¶ 67–119 (covering the period from June 20, 2005 through November 16, 2006). These negotiations featured successive audits of Boeing's proposals conducted by the Defense Contract Audit Agency (DCAA). See id. ¶¶ 68–70, 77–78, 85–86.

Thus, in July and August 2005, DCAA first determined that Boeing's initial proposals for the ELC and ELS contracts were "inadequate as a basis for negotiation of a fair and reasonable contract price" for a number of reasons, including "potential noncompliances with CAS 406."[15] See PA 1260–96 (ELC proposal audit report, dated July 29, 2005); id. at 1297–1327 (ELS proposal audit report, dated August 5, 2005). With respect to the ELC contract, DCAA noted that Boeing's proposal "included approximately $333 million of previously incurred [PM&HS] costs," which Boeing "propose[d] to 'roll-forward' to the ELC contract" in a manner that might not comply with CAS 406. See id. at 1262. As to the ELS contract, DCAA observed that in implementing its lot accounting practice "to arrive at total Lot 1 hardware costs," Boeing proposed to sum the "costs incurred . . . since 1997" with "an [estimate] of [the] costs required for completion of [the Lot] . . . in approximately 2011." Id. at 1300. According to DCAA, this practice—i.e., "averaging significant costs over an extended period of time"—was "potentially noncompliant with . . . CAS 406[]." Id.

In the wake of DCAA's conclusions, the Air Force considered obtaining CAS waivers for the ELC and ELS contracts, but never did so. See Pls.' SUMF ¶¶ 72–74; PA 1393, 1401.

---

and avoid possible subsequent disputes or disallowances." Raytheon Co. v. United States, 105 Fed. Cl. 236, 243 n.17 (2012) (citing FAR 31.109), aff'd, 747 F.3d 1341 (Fed. Cir. 2014). In particular, the FAR encourages parties to "seek advance agreement on the treatment of special or unusual costs." FAR 31.109(a). Ideally, however, such agreements "should be negotiated before incurrence of the costs involved." Id. § 31.109(b). Further, contracting officers are "not authorized . . . to agree to a treatment of costs inconsistent with this part." Id. § 31.109(c).

[14] According to Boeing, when it submitted its initial proposals, it also expected to "recover through the firm fixed prices for missions awarded under the [new] ELS contract" any "hardware production costs it had incurred prior to the restructure and which [it] had . . . inventoried" using lot accounting. See Pls.' SUMF ¶¶ 64–65; see also PA 1647–48; DA 982. The issues related to these deferred production costs are discussed in more detail below.

[15] For convenience, the Court uses "CAS" to refer to the different provisions found in FAR Part 9904, so that "CAS 406" is the equivalent of "FAR 9904.406." Further, as discussed in more detail below, CAS 406 concerns "the selection of the time periods to be used as cost accounting periods for contract cost estimating, accumulating, and reporting." See CAS 406–20.

## V.       ELC Contract Negotiations and Execution

### A.       Revised ELC Proposal and DCAA's Second Pre-Negotiation Audit

Boeing eventually submitted a revised proposal for the ELC contract on January 17, 2006. Pls.' SUMF ¶ 75. In it, Boeing proposed that the government make payments to it each year in amounts derived from Boeing's inventoried PM&HS costs, such that the total payments after six years would equal an agreed-upon amount for those costs. See PA 1596.

Several months later, on May 8, 2006, DCAA issued an audit report regarding the revised proposal. See PA 1593–1635. Unlike the prior reports, this report omitted any reference to potential CAS violations presented by the lot accounting or Boeing's deferred costs.[16] See id. Further, DCAA determined that the revised proposal was "inadequate in part for negotiation of a fair and reasonable price," rather than wholly inadequate.[17] See id. at 1594 (emphasis added).

### B.       Memorandum of Understanding

Based on DCAA's conclusion that the revised proposal was merely "inadequate in part," id. at 1594, the parties moved forward with negotiations. Soon afterward, on June 19, 2006, the parties executed a memorandum of understanding (MOU) describing "the conditions and understandings pursuant to which [they] h[ad] agreed, in principle, to enter into" the ELC contract. Id. at 1636; see also Pls.' SUMF ¶ 79. In particular, they agreed that the contract would include a "fixed price CLIN" devoted to paying deferred support costs, the total value of which "w[ould] be calculated over an estimated 8 year period." PA 1638. Further, the parties provided that the execution of the ELC contract "may be contingent upon the execution and approval" of advance agreements concerning lot accounting and the DSC costs. Pls.' SUMF ¶ 81 (quotation omitted).

---

[16] The government states that it "disputes any suggestion that the May 8, 2006 Audit Report concluded that Boeing's proposed recovery of its inventoried PM&HS costs on the ELC contract was in fact compliant with the CAS" because the report did not affirmatively opine that the proposal was CAS-compliant. See Def.'s SUMF Resp. at 27–28.

[17] Although it did not identify any CAS noncompliance in the proposal, DCAA observed in an extended discussion that "the unabsorbed PM&HS cost pool contain[ed] costs associated with a significant number of launches (primarily commercial) that were anticipated in 1998" but that never occurred. PA 1596. DCAA expressed its "belie[f] that some of these costs may not be allocable to this and future EELV contracts in accordance with [the Air Force's] Revised Acquisition Strategy," which, as noted, "stat[ed] that losses incurred under the 1998 OTA and ILS contracts . . . w[ould] not be recoverable under [the restructured contracts]." Id. (quotation omitted). Nevertheless, DCAA was of the view that "whether or not payment of these costs w[ould] further the objective to maintain Assured Access to Space" was "a procurement decision." Id. at 1597.

C.     **Negotiating and Finalizing the Lot Accounting and DSC Advance Agreements**

1.     **Drafts and DCAA's Audits**

Soon thereafter, the parties exchanged drafts of the DSC and Lot Accounting advance agreements that Boeing sought. See id. ¶¶ 83–84. By this point, personnel from the Defense Contract Management Agency (DCMA) had become deeply involved in the negotiations, and, in September 2006, DCMA requested audit service from DCAA regarding the draft advance agreements. See PA 1745–52. In particular, DCMA inquired about whether the advance agreements complied with CAS and the applicable provisions of the FAR. Id. at 1747, 1751.

With respect to the deferred support costs, DCAA referred DCMA to its previous audit, stating that the "audit did not disclose any CAS or FAR noncompliances." Id. at 1747. It observed, however, that (as noted above) it had qualified its opinion with regard to the interplay of DSC and the Air Force's acquisition strategy, and stated that this qualification "could affect FAR compliance." See id. And as to lot accounting, DCAA stated that it had "not identif[ied] any FAR [or] CAS noncompliances."[18] Id. at 1752.

2.     **Revisions Made By the Contract Management Board of Review**

In November 2006, the government convened a contract management board of review (Review Board) to consider whether executing the proposed advance agreements would be in the government's best interests.[19] See Pls.' SUMF ¶¶ 88–91. According to minutes summarizing the meeting, the Review Board observed that "concern had been expressed that" if "costs incurred and anticipated under the prior . . . contract" were "transitioned" to the restructured contracts, the government would in effect be "subsidizing Boeing for past losses." PA 2401. According to the Review Board, however, "the supporting documentation for the[] [advance] agreements shows that the Government affirmatively determines there not to be a subsidy." Id.

With respect to the Lot Accounting advance agreement, the Review Board noted that Boeing "[r]ecognized that the [contracting officer] could not award a contract with noncompliant

---

[18] DCAA did observe, however, that the continued use of lot costing could "put[] the government at increased risk" of paying higher prices for launches because it could lead to the inclusion of "escalated costs well into the future when pricing current requirements." PA 1752. The cause of this escalation was the steep rise of Boeing's projected corporate labor rates over time and the long duration of the lot; put together, these factors meant that the further out the final Lot 1 launch date slipped, the greater the "average" labor rate included when pricing a launch. See id. (noting that that "a $30 per hour 1996 labor rate" would grow to "a $61 per hour 2011 labor rate" and then up to a "$99 per hour [rate] for 2021").

[19] While the Board itself consisted of four voting members, the meeting was attended by numerous representatives from multiple stakeholders, including DCAA, the Air Force, the Air Force's general counsel's office, and the National Reconnaissance Office. See Pls.' SUMF ¶¶ 89–90; Def.'s SUMF Resp. at 31–32.

accounting practices." Id. at 2402. It also "confirmed" that DCAA had concluded (in its second pre-negotiation audit) that lot accounting did not violate CAS. Id.

The Review Board itself, however, "declined to give any express approval of [the] practice." Id. at 2403. It therefore revised the proposed agreement to state that "as of the date [of the advance agreement's execution], the undersigned [contracting officer] has found Lot Accounting a compliant practice under the [CAS]." Id. Further, the revised agreement stated that "[t]his determination is not intended to and does not prevent the revocation, withdrawal, or reconsideration of this determination if subsequent facts indicate that some aspect of this disclosed practice is noncompliant with CAS or FAR." Id.

As for the DSC advance agreement, the Review Board observed that "to some, [the] PM&HS [costs] appeared to consist of failed business costs being carried forward." Id. But "[a]fter discussing" the issue "at length," the Board determined "under the lot accounting concept, Boeing was not attempting to transfer period costs . . . to a later accounting period" via the DSC advance agreement; instead, it was "attempting to recover legitimate costs within the scope of Government accounting and contract rules." Id. at 2404. The Review Board then settled on the following language for the DSC advance agreement:

> [T]he parties agree that the amount of $271,152,672 represents costs for program management and hardware support under the Delta 4 program that were incurred and placed in an inventory account prior to June 1, 2006, but were neither allocable to nor payable under obligations on contracts entered into or performed prior to that date. The Air Force has discussed the potential to compensate the contractor for such unreimbursed expenses on a separate line item on future contracts, and has agreed on a method by which the contractor may be paid for 1/8 share of such $271,152,672 amount as a fixed-price contract line item in each year of future contracts, if awarded. Any such line item related to these expenses is separate from recovery of costs under cost-reimbursement provisions of such contracts.

Id. Having made these revisions, the Review Board ultimately determined that the advance agreements were in the government's best interests. Id. at 2406.

**D.    ELC Contract Execution**

Boeing and the government executed the DSC advance agreement on November 8, 2006. Pls.' SUMF ¶ 104. The following week, on November 13, 2006, the parties executed the Lot Accounting advance agreement. Id. ¶ 114. The executed agreements contained the operative language described above. See id. ¶¶ 104, 114.

Three days later, on November 16, 2006, the parties executed the ELC contract. Id. ¶ 120. The ELC contract expressly incorporated the DSC and Lot Accounting advance agreements and stated that "[e]ach Advance Agreement [wa]s an integral part of this contract that was a

substantial factor in determining Contract value."[20] Id. ¶ 121 (quoting PA 2384). The contract also stated that for fiscal years 2006 and 2007, Boeing would "bill deferred support on an annual basis under CLINs 1501 and 1502." Id. ¶ 122 (quoting PA 2391). The total amount to be paid in those two years equaled $67,788,168.[21] Id. ¶ 123.

## VI.     The Formation of ULA and Novation of the ELC Contract

In the meantime, some months before executing the ELC contract, on May 2, 2005, Boeing entered into a joint venture agreement with Lockheed Martin to form United Launch Alliance (ULA), of which ULS is a subsidiary. See id. ¶¶ 34, 132. The JV agreement became effective December 1, 2006. See id.

As discussed below, throughout 2007, the parties turned their attention to negotiating the ELS contract, which they executed on January 24, 2008. See id. ¶ 145. Within a few months, by mid-April 2008, Boeing's EELV contracts (including the legacy ILS contract, the ELC contract, and the ELS contract) had been novated to ULS.[22] Id. ¶¶ 132–135. Like the original ELC contract, the novated ELC contract incorporated the DSC and Lot Accounting advance agreements. Id. ¶ 135.

## VII.     ELS Contract Negotiations and the Formation

### A.     ULA Abandons Lot Accounting Retroactive to December 1, 2006

After it began operations in late 2006, ULA determined that it needed to adopt "like accounting practices" for the "efforts [it] performed on the Atlas and Delta IV programs" because ULA was a new company and those programs were "common in both business nature and scope." PA 2647; see also Pls.' SUMF ¶ 141; DA 1052 (letter to DCMA from James Hardin, Jr., ULA's Vice President and Controller, observing that "[i]n accordance with GAAP, ULA must . . . [h]ave the same business and accounting practices for both Atlas and Delta"). By July 2007, ULA had elected to use Lockheed Martin's "heritage practice" of "Annual Production Cycle (APC)" accounting, which Lockheed had used for the Atlas program, rather than Boeing's lot accounting practice or an entirely new practice. DA 1052; see also Pls.' SUMF ¶ 141. In summarizing this decision, Mr. Hardin noted his belief that as a new company, ULA could not adopt lot accounting because "the Lot Accounting inventory process . . . does not conform to GAAP." DA 1052; see also id. at 1109 (letter to DCAA from Mr. Hardin concluding that ULA "could not adopt the heritage Boeing practice . . . of lot cost (program method) accounting").

---

[20] The contract further stated that the Lot Accounting advance agreement would "also be incorporated into the interdependent EELV Launch Services Contract, if awarded." Pls.' SUMF ¶ 121 (quoting PA 2384).

[21] Later contract modifications added CLINs 1503 (payments for fiscal year 2008) and 1504 (payments for fiscal year 2009). Pls.' SUMF ¶ 128.

[22] The parties dispute the precise timing of the novation, as well as the exact nature of the program assets that Boeing transferred to the joint venture. See Def.'s SUMF Resp. at 47–48.

ULA made this change retroactive to December 1, 2006, the date it started independent operations. See DA 1053; Pls.' SUMF ¶ 141.

### B.     Negotiations and Formation of the DPC Advance Agreement and the ELS Contract

The switch to APC accounting caused a complication with respect to certain direct hardware production costs—known as deferred production costs (DPC)—that Boeing had incurred and inventoried before December 1, 2006.[23] See Pls.' SUMF ¶ 142; PA 2621. Under APC accounting, "the costs incurred to produce particular items of hardware" would be allocated entirely "to those units in production during the year the cost was incurred." Pls.' SUMF ¶ 142. But, as with the DSC costs, when Boeing had incurred such hardware production costs prior to 2006, it had inventoried them using lot accounting and associated a portion with units to be produced/sold in future years under anticipated launch contracts, rather than to units in production during the years the costs were incurred. See PA 2621; see also DA 1095 (describing these costs as a "wedge" of previously incurred costs). Switching to APC accounting could therefore have the effect of "isolat[ing]" these inventoried hardware production costs from allocation to future missions. See PA 2621.

Throughout the latter half of 2007, the parties worked to negotiate an acceptable advance agreement regarding the treatment of the DPC, while simultaneously negotiating the ELS contract. See Pls.' SUMF ¶¶ 143–44. On January 24, 2008, before signing an advance agreement, Boeing and the Air Force executed the ELS contract. See id. ¶ 145.

Two months later, on March 25, 2008, the parties executed the DPC advance agreement. Id. ¶ 149; see also PA 2627–28. Under the agreement, DCAA was to "audit the amount, the allowability[,] and the allocability of the proposed costs." PA 2627. "Following" the audit, the parties "agree[d] to negotiate a fair and reasonable value representing the total Delta IV [DPC] . . . that were incurred and placed in an inventory account prior to December 1, 2006, but were neither allocable nor payable under obligations on contracts entered into or performed prior to that date." Id. Further, they agreed to "allocate the negotiated . . . costs to future Delta IV launch service missions . . . until the total negotiated value has been liquidated." Id. According to the agreement, the costs would be "in addition to whatever costs are allocable to, and are allowable costs under such future missions pursuant to the [APC] costing methodology." Id.

## VIII.   The Genesis of the Instant Dispute

### A.     DSC

### 1.     The 2008 GAO Report and Subsequent IG Report

In July 2008, the Government Accountability Office (GAO) issued a report criticizing DCAA's handling of several audits, including its 2006 audit of Boeing's revised ELC contract proposal. See id. at 2769–86. In particular, GAO concluded that its investigation had

---

[23] These costs included costs for "production labor, associated burden[,] and appropriate other direct cost[s]." PA 2627.

"substantiated concerns" that had been raised about "(1) buying command and contractor pressure for a favorable audit opinion and (2) an unsupported change in the draft audit opinion that was directed by DCAA Western Regional officials." Id. at 2780; see also id. at 2781 (stating that DCAA "auditors told [GAO] that they were instructed by the [Regional Audit Manager] not to document CAS compliance issues in the[ir] workpapers").

Two months later, in September 2008, the Senate Committee on Homeland Security and Governmental Affairs held a hearing on the issues raised in the GAO report, at which at least one DCAA auditor gave testimony. See Pls.' SUMF ¶¶ 168–72. Further, at the request of the Senate Armed Services Committee, the DoD's Inspector General (IG) then conducted a follow-up investigation. See id. ¶¶ 166–67, 174; see also PA 3139–83 (final IG report). In preliminary findings circulated on October 20, 2008, the IG "recommend[ed] that the Air Force take immediate action to suspend potentially improper payments under the EELV program and . . . reassess the propriety of [the] existing advance agreements." PA 2887. The IG later issued a final report on August 31, 2009, in which it described the 2006 audit as "flawed"; reiterated the recommendations in its preliminary findings; and further recommended that the Air Force "cease negotiations" on the DPC costs. Id. at 3142, 3146.

## 2.       DCAA's 2010 Re-Audit

In response to the GAO report, DCAA opened a new audit of the inclusion of the DSC costs in Boeing's ELC contract. See id. at 2799; see also Pls.' SUMF ¶ 164. It completed the audit and issued a final report on July 23, 2010. Pls.' SUMF ¶ 205; see also PA 3431–82. In the report, DCAA concluded that Boeing was in non-compliance with CAS 406 (concerning cost accounting periods) and CAS 405 (governing accounting for unallowable costs). PA 3432. According to DCAA, "[t]he CAS 406 noncompliance was caused by Boeing's use of the lot accounting inconsistent with the CAS requirements." Id. The CAS 405 noncompliance, meanwhile, resulted from Boeing's inclusion in the proposal of "deferred support costs [that] represent[ed] losses that are expressly unallowable under the provisions of FAR 31.205–23, Losses on Other Contracts." Id.

DCAA also observed that "[t]o date, the contractor has billed the Government for $101,435,379 of the deferred support costs and has received $72,198,875 of the billed amount." Id. It also noted that its "examination d[id] not provide [a] legal determination on [Boeing's] compliance with the specified requirements." Id. at 3433.

## 3.       The Administrative Contracting Officer's Non-Compliance Decision

Nearly a year later, on June 16, 2011, the responsible administrative contracting officer issued a final decision finding that "Boeing's Lot Accounting practice is noncompliant with CAS 406 . . . and CAS 405." Id. at 3836. According to the CO, "the increased cost in the aggregate . . . is $271,152,672[,] of which $72,198,875 has been paid." Id. The CO therefore

"assert[ed] a . . . claim for $72,198,875 in principal and $17,036,292 in interest . . . for a total claim of $89,235,167."[24] Id.

## B.   DPC

Following the execution of the DPC advance agreement in March 2008, Boeing submitted a proposal that purported to "serve[] to both identify the total value of the recoverable deferred production cost[s] and demonstrate the methodology utilized to appropriately calculate this value." Id. at 2629; see also Pls.' SUMF ¶ 229. The proposal "estimated $114.1 million of DPC within the scope of the ELS Contract." Pls.' SUMF ¶ 229; see also id. ¶¶ 230–32 (describing the methodology Boeing used to derive this figure). Boeing also noted that "[t]he proposal . . . [wa]s subject to audit by [DCAA] and final negotiation with [the Air Force]." PA 2629.

Although DCAA circulated a draft audit of the proposal in November 2008, see Pls.' SUMF ¶ 235, it did not issue a final audit report until May 3, 2011, id. ¶ 244; see also PA 3591–3616. In the report, DCAA "questioned the proposed costs in total" and stated that it "d[id] not believe the proposal [was] an acceptable basis for negotiating a fair and reasonable deferred production cost amount." PA 3593. It also stated that Boeing would be in non-compliance with CAS 406 and CAS 405 if it "propose[d] . . . and subsequently bill[ed] . . . the DPC on CAS covered contracts," and noted that it had "initiated a separate assignment" to evaluate such non-compliances. Id. at 3594.

At the close of that separate assignment, on October 20, 2011, DCAA issued another audit report. See Pls.' SUMF ¶ 245; see also PA 3918–46. In that report, DCAA concluded that Boeing was further "in noncompliance with" CAS 406 and CAS 405 based on its inclusion of estimated amounts for DPC in certain proposals it had submitted for launches under the ELS contract. PA 3921. DCAA also noted its belief that the DPC advance agreement was "not valid" because it did not "accord[] with . . . FAR 31.109(c) which states[] [that] '[t]he contracting officer is not authorized . . . to agree to a treatment of costs inconsistent with this part.'" Id. at 3931 (quoting FAR 31.109(c)).

Based on these determinations, DCAA recommended that the Air Force "rescind the [DPC] advance agreement"; "[e]nsure that no payments are made to the contractor for unallowable deferred production costs"; and "modify all ELS contracts . . . to remove references to the DPC." Id.

About two months later, on December 12, 2011, a divisional administrative contracting officer sent Boeing a notice of potential noncompliance with CAS 406 and CAS 405. Pls.' SUMF ¶ 253; see also PA 3963–64. Boeing responded to the notice on February 10, 2012. Pls.' SUMF ¶ 254. Boeing filed this lawsuit before the CO issued a final finding. See id.

---

[24] Boeing paid over the requested amount by July 5, 2011. See Pls.' SUMF ¶ 228.

## IX.    Boeing's Claim for Recovery of DSC and DPC

On November 10, 2011, Boeing submitted a certified claim to the CO "seeking relief with respect to both DSC and DPC." Id. ¶ 284. In terms of DSC, Boeing sought both the return of the $89,235,167 it had paid to the government following the June 16, 2011 final decision, as well as $33,894,084 that Boeing claimed was due for the 2011 fiscal year. See id. ¶ 285. As to DPC, Boeing requested $40,956,790 "for those missions that had been ordered and definitized by the Government as of the date the claim was submitted" and $19,158,582 "for those missions that, when they were ordered, were the subject of 'not-to-exceed' prices that did not include DPC, but that had not yet been definitized as of the date the claim was submitted." Id. ¶ 286.

The Air Force denied the claim on May 15, 2012. Id. ¶ 288; see also PA 4216–24 (DPC); PA 4225–32 (DSC). First, regarding DSC, the CO observed that the government had previously determined that "Boeing's Lot Accounting was not compliant with CAS 406 and 405, and that DSC were not allowable." PA 4230. Further, according to the CO, the inclusion of DSC CLINs in the ELC contract "did not create an irrevocable binding contractual obligation to recognize DSC as an allowable cost, or pay unallowable DSC." Id.; see also id. at 4231 (observing that a CO's "authority d[oes] not extend to making determinations contrary to law," and that "the procurement authority of the [relevant COs] was expressly limited by the EELV Revised Acquisition Strategy and FAR 31.205–23, which prohibit[s] the recovery of losses on other contracts").

Second, as to DPC, the CO determined that neither the execution of the DPC advance agreement nor the award of individual launches under the ELS contract "create[d] any contractual obligation to recognize the allowability of DPC costs." Id. at 4223. He also observed that the DPC advance agreement in fact "state[d] that any further negotiation of DPC is subject to full audit." Id. Further, as with DSC, he noted that "[t]o the extent DPC may represent losses on prior contracts, the [CO's] procurement authority . . . was also expressly limited by the EELV Revised Acquisition Strategy and FAR 31.205–23, which prohibit[s] the recovery of losses on other contracts," and that the CO's "authority did not extend to making determinations contrary to law." Id.

## X.    This Action

Boeing filed suit here on June 14, 2012. ECF No. 1. It later filed the operative supplemental complaint on August 14, 2015. ECF No. 67-1.

In Count I of its complaint, Boeing contends that "[n]othing in CAS or federal law or regulations precludes the recovery of DSC" under the ELC contract, and therefore that the government has breached that contract by demanding repayment of the $72,198,875 that it paid Boeing under CLINs 1501, 1502, and 1503, and refusing to make any further DSC payments. See Suppl. Compl. ¶¶ 202–03.

Further, in Count II, Boeing asserts that the government has breached the ELS contract by failing to negotiate a reasonable value for the DPC costs and allocate it among missions under the ELS contract, as it allegedly promised to do. Id. ¶ 209. As a result, Boeing claims it has suffered damages "in the amount of $106,095,968, which is the total amount included in

16

reservation-of-rights clauses with respect to DPC for the post-ILS contract missions that have been ordered and definitized by the Air Force, plus any additional reasonable rate of return due on the unpaid DPC amounts." Id. ¶ 217.

The government filed an answer and counterclaim on October 9, 2015. ECF No. 72. As relevant here, the government stated as an affirmative defense that Boeing's claims were "barred by illegality as the procurement contracting officer had no authority to agree to pay DSC or DPC, and any agreement to pay DPC or DSC violates Cost Accounting Standards 406 and 405 and the Federal Acquisition Regulations." Def.'s Answer to Pls.' Suppl. Compl. & Countercl. ¶ 265.

Given the case's factual complexity and the parties' interest in exploring settlement, the discovery period lasted several years. See, e.g., ECF Nos. 48, 56, 85. In March 2016, the parties informed the Court of their intention to mediate the case, ECF No. 96, and, at their request, the Court stayed the case in June 2016, ECF No. 103. But the mediation was unsuccessful, and the Court lifted the stay on March 31, 2017. ECF No. 112.

Thereafter, on November 11, 2017, Boeing filed a motion for summary judgment as to Counts I and II of its complaint. ECF No. 116. The government filed its response in opposition on February 23, 2018. ECF No. 125. It did not rely on CAS 405 as a ground for its affirmative defense in its brief. See id. The Court heard oral argument on June 21, 2018. See ECF No. 131.

## DISCUSSION

### I.   Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). Subsection (a)(2) of the Tucker Act further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the Contract Disputes Act (CDA)—"including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." Id. § 1491(a)(2).

The CDA, in turn, applies to, among other things, an "express or implied contract . . . made by an executive agency for . . . the procurement of services." 41 U.S.C. § 7102(a). Under the CDA, it is a jurisdictional prerequisite that the CO issue a final written decision on any claim by the contractor before an action is brought in this court. See id. § 7103(a), (d); M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010). But a contractor is not required to file its own claim with the CO before challenging a claim by the government in this court, so long as in the CO has issued a final decision on the government's claim. See Placeway Constr. Corp. v. United States, 920 F.2d 903, 906 (Fed. Cir.

1990); Bechtel Nat'l, Inc. v. United States, 137 Fed. Cl. 423, 428, appeal docketed, No. 18-2055 (Fed. Cir. June 11, 2018); Tiger Nat. Gas, Inc. v. United States, 61 Fed. Cl. 287, 292–93 (2004).

Here, as discussed, the government issued final decisions on its own claims related to DSC in June 2011. Further, the CO issued final decisions denying Boeing's DSC and DPC claims in May 2012. The Court therefore has jurisdiction over this case.

## II.    Standards

### A.    Motion for Summary Judgment

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(a) of the Rules of the Court of Federal Claims; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994). All significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248).

Further, "a claimant's motion for summary judgment should be denied when any defense presents significant factual issues that should be tried." 10B Charles Alan Wright et al., Federal Practice and Procedure § 2734 (4th ed. 2018). The government, however, ultimately bears the burden of proof with respect to its affirmative defense. Energy Nw. v. United States, 91 Fed. Cl. 531, 554 (2010) (citing Siverson v. United States, 710 F.2d 557, 560 (9th Cir. 1983)), aff'd in part, rev'd in part, vacated in part on other grounds, 641 F.3d 1300 (Fed. Cir. 2011); cf. Raytheon Co. v United States, 747 F.3d 1341, 1352 (Fed. Cir. 2014) (observing that "the Government bears the burden of proving that a contractor's accounting practices do not comply with the CAS"). Thus, where the plaintiff has moved for summary judgment and the government has asserted an affirmative defense, the "plaintiff bears the burden of persuading the court that, with respect to those issues on which [the government] bears the burden of proof at trial, [the government's] evidence is insufficient to establish at least one essential element of [its] affirmative defense." McDonald v. United States, 13 Cl. Ct. 255, 259 (1987).

### B.    Breach of Contract

The elements of a breach of contract claim are familiar: the plaintiff must establish (1) the existence of a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by that breach. San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Further, contract interpretation presents a question of law. See Jowett, Inc. v. United States, 234 F.3d 1365, 1367–

68 (Fed. Cir. 2000). "In interpreting a contract," the court "begin[s] with the plain language" and "give[s] the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." Id. at 1368 (first quoting McAbee Constr. Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996), then quoting Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)). The court aims to "interpret the contract in a manner that gives meaning to all of its provisions and makes sense," id. (quoting McAbee, 97 F.3d at 1435), considering "the intent of the parties at the time they contracted, as evidenced by the contract itself," Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988).

### C.   Appeal from a CO's Decision Under the CDA

An appeal from a CO's decision under the CDA "proceed[s] de novo" in this court. 41 U.S.C. § 7104(b)(4). Thus, in such an appeal, "the findings of fact in [the CO's] decision . . . are not entitled to any deference," and "[t]he contractor has the burden of proving the fundamental facts of liability and damages de novo." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994); see also Meridian Eng'g Co. v. United States, 885 F.3d 1351, 1360 (Fed. Cir. 2018). In other words, "the parties start in court . . . with a clean slate." Wilner, 24 F.3d at 1402.

## III.   Merits

As noted, the existence of a genuine factual dispute precludes the grant of summary judgment. Therefore, Boeing cannot succeed on its motion if there is a genuine factual dispute regarding whether the government's refusal to pay the DSC CLINs and to negotiate and make DPC payments constitutes a breach of the ELC and ELS contracts.

The government argues that there is such a dispute because the issue of whether the DSC and DPC costs are allowable (and, thus, legally payable) is a factual one. The root of this argument is its assertion that the DSC and DPC costs are not allowable unless Boeing's lot accounting practice (from which they are unquestionably derived) complied with GAAP, and that Boeing's GAAP compliance is a genuinely disputed question of fact.

Boeing takes the position that, as a matter of law, the government's affirmative defense of illegality can succeed only if paying the DSC and DPC costs would be "plainly and palpably" illegal—i.e., if the costs were plainly and palpably unallowable. And, it asserts, there is no genuine dispute that they were not.

Further, it contends that, in any event, Boeing's GAAP compliance is not relevant to the allowability of the DSC and DPC costs under any standard; and that, even if it were, there is no genuine factual dispute regarding Boeing's GAAP compliance because GAAP allows for a range of reasonable accounting practices, and the government has not shown that Boeing's accounting choices could be considered unreasonable.

For the reasons discussed below, the Court concludes that the "plain and palpable" standard advanced by Boeing is inapplicable here. Further, the Court concludes that if Boeing's accounting practices did not comply with GAAP, the DPC and DSC costs are unallowable costs, such that the government would prevail on its affirmative defense to breach of contract. In addition, the Court concludes that genuine factual disputes exist regarding Boeing's GAAP compliance. Finally, the factual background and issues in this case are exceptionally complex

and the Court believes that its understanding of those issues would be enhanced if the case were tried rather than decided on summary judgment. Accordingly, Boeing's motion for summary judgment is **DENIED**.

### A.   Boeing's Reliance Upon the "Plain and Palpable" Standard Is Misplaced

Boeing first argues that, as a matter of law, the government's affirmative defense of illegality cannot succeed unless the government's promises to pay the DSC costs and to negotiate and pay the DPC costs were "plainly and palpably" illegal. Thus, under Boeing's theory, if the Court were to ultimately determine that the payment provisions were illegal, but not plainly and palpably so, the Court would be compelled to award it damages for breach of contract on Counts I and II of its complaint.[25] For the reasons set forth below, Boeing's legal argument lacks merit.

### 1.   Contractual Payment Provisions That Are Inconsistent with Law Are Unenforceable

It is well established that contracting officers lack the authority to bind the government to contractual payment provisions that are contrary to statute or regulation (including the FAR), and that such provisions are therefore not enforceable. See Barrett Ref. Corp. v. United States, 242 F.3d 1055, 1060 (Fed. Cir. 2001) (payment clause that did not comply with the FAR was "unauthorized and unenforceable"); Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1151–53 (Fed. Cir. 1983) (describing such provisions as "defect[ive]" and non-payable, and observing that the government "had no power to enter into the challenged price terms"); Yosemite Park and Curry Co. v. United States, 582 F.2d 552, 560 (Ct. Cl. 1978) (observing that where "the provisions in the express, written contract . . . are in violation of the F[A]R . . . it is clear that the Government c[an] no longer be bound by th[o]se terms"); cf. Fluor Enters., Inc. v. United States, 64 Fed. Cl. 461, 491–92 (2005) ("[A] government agency can not [sic] validly contract to pay funds in contravention of a federal statute because any 'payment of funds from the Treasury must be authorized by a statute.'" (quoting Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 424 (1990))).

Thus, because contracting officers lack the authority to bind the government to illegal payment provisions, a court will not award damages for breach of contract based on such provisions. In Yosemite Park, for example, the government defended against a breach of contract claim by asserting that certain payment terms to which the government had agreed (and under which the plaintiff had been performing) were inconsistent with applicable procurement statutes and regulations. 582 F.2d at 555. The court of appeals held that the provisions were incompatible with the legal authority the government had cited and ruled that the payment terms were therefore unenforceable as written. Id. at 560–61. Similarly, in Barrett Refining, the parties had agreed to a price escalation clause that was inconsistent with governing procurement law. 242 F.3d at 1060. Because that clause was unenforceable, the court concluded that the plaintiff could

---

[25] Indeed, the gravamen of Boeing's summary judgment motion is that there is no genuine dispute of fact that the agreements were not plainly and palpably illegal, such that the Court should grant summary judgment in its favor. See Pls.' Mem. in Supp. of Mot. for Summ. J. on Counts I & II of Suppl. Compl. (Pls.' Mem.) at 20, 39–40, ECF No. 116-1.

not claim damages under the contract for its breach. See id. at 1060 & n.2 (observing that "[t]he determination . . . that only the price escalation term was unenforceable and invalid, and that the entire contract was not invalid, [wa]s consistent with our case law").

It follows from these cases that if the payment terms at issue here—i.e., the terms regarding the payment of DSC and DPC costs—mandated payment contrary to applicable regulations, the CO lacked the authority to bind the government to them. It further follows that to the extent that such authority was lacking, Boeing cannot recover breach of contract damages based on the government's refusal to pay those costs.[26]

## 2.     The Plain and Palpable Illegality Standard is Not Applicable

Notwithstanding the foregoing, Boeing contends that even if the payment terms at issue in this case violated the applicable regulations, they may still be enforced through a breach of contract action, unless they were plainly and palpably illegal. See Pls.' Mem. at 20; Pls.' Reply in Supp. of Mot. for Summ. J. on Counts I & II of Suppl. Compl. (Pls.' Reply) at 4, ECF No. 127 (asserting that "the Government must show that the illegality . . . was so obvious at the time of contracting that it was unreasonable for either the contracting officer or the contractor to view the agreement as lawful" (quotation omitted)). However, the cases upon which it relies in support of this contention in its opening brief—United States v. Amdahl Corp., 786 F.2d 387 (Fed. Cir. 1986), and John Reiner & Co. v. United States, 325 F.2d 438 (Ct. Cl. 1963)—are inapposite, as are the other subsidiary cases it cites in its reply brief.

Both Amdahl and John Reiner arose following the cancellation of contract awards after competitors lodged successful bid protests. In both cases, it had been determined that the awards were "made contrary to statutory or regulatory requirements." See Amdahl, 786 F.2d at 391, 394–95; John Reiner & Co., 325 F.2d at 439–40. In both cases, the issue was the effect of the illegality of the contract award upon claims that flowed from the cancellation of the illegally awarded contracts.

In Reiner, a contract awardee brought suit after an agency cancelled its contract award upon the recommendation of the Comptroller General. See 325 F.2d at 439–40. The Comptroller General had concluded that the award was improper, reasoning that the solicitation "did not adequately inform bidders as to how they should bid with respect to delivery dates." Id. at 439. The Court of Claims stated that the question before it was "whether the award was illegal and void so that the plaintiff cannot found a court action upon it." Id. at 440. Citing concerns of fairness to the contractor, it held that "the court should ordinarily impose the binding stamp of

---

[26] It bears noting, however, that while the plaintiffs in Yosemite Park and Barrett Refining could not recover under the terms of the contract, they were not left entirely without a remedy. In Yosemite Park, the court held that the plaintiff should be provided relief on "a quantum meruit [basis] for the reasonable value of the services received by defendant." 582 F.2d at 560. And in Barrett Refining, the court of appeals held that the plaintiff could receive monetary relief on a quantum valebant basis. 242 F.3d at 1060–61. Quantum meruit relief applies to services, and quantum valebant applies to goods. See Urban Data Sys., 699 F.2d at 1154 n.8.

nullity [on a contract award] only when the illegality is plain." Id. It then found that the award before it was not plainly illegal and so should not have been deemed a nullity. Id.

Nonetheless, the Court of Claims did not award the plaintiff damages for breach of contract. Instead, it converted the rescission of the contract into a termination for convenience under the contract's termination for convenience clause, and made an award to the plaintiff based on the cost of performance plus a reasonable profit. See id. at 442–44.

In Amdahl, a disappointed potential bidder successfully protested a sole-source award before the Board of Contract Appeals (BCA) on the ground that the award was illegal, and the government challenged the remedy that the BCA had ordered. See 786 F.2d at 389. As in Reiner, the court of appeals "start[ed] with the proposition that the failure of a contracting officer to comply with statutory requirements in making an award renders the contract a nullity." Id. at 392. Nonetheless, the court observed, "in many circumstances it would violate good conscience to impose upon the contractor all economic loss from having entered an illegal contract." Id. at 393. Therefore, it noted, where "the invalidity of the contract award was not plain," it may be "treated as valid up to the time of cancellation," and the contractor may recover "the cost of performance plus a reasonable profit on those costs." Id. at 394 (emphasis added) (discussing Reiner, 325 F.2d at 440).

Importantly, the court of appeals explained that in such circumstances, "[t]he contractor is not compensated under the contract, but rather under an implied-in-fact contract." Id. at 393; see also id. (observing that, in Reiner, "[n]otwithstanding the 'deemed' initial lawfulness of the contract, the . . . court did not award damages for its breach"); Trilon Ed. Corp. v. United States, 578 F.2d 1356, 1359–62 (Ct. Cl. 1978) (where agency reversed initial determination of responsibility under procurement regulations and cancelled contract, contractor was not left without remedy; cancellation, while erroneous, was not plainly so and was made in good faith, and thus proper remedy was to convert cancellation into termination for convenience so that contractor could recover expenditures and reasonable profit up to date of termination).

Amdahl and Reiner are distinguishable from this case. Each involved the cancellation of a contract award based on its illegality; and in each case, the court of appeals discussed the concept of plain and palpable illegality only in the context of securing equitable relief following such a cancellation, such as conversion of a cancellation into a termination for convenience. This case, of course, does not concern the legality of a contract award. Nor does it involve the government's decision to cancel the contract in its entirety. Rather, this case—like Yosemite Park, Barrett Refining, and Urban Systems, concerns the legality and enforceability of specific contractual payment provisions. The "plain and palpable" standard was not applied in those cases.[27]

---

[27] In fact, in Amdahl, the court of appeals cited Urban Data Systems and Yosemite Park as supporting the proposition that "a contractor assume[s] the risk that an agency ha[s] actual authority to enter into the bargain to which the parties agreed." 786 F.2d at 393 (quotations omitted).

In another case upon which Boeing relies in its reply, American Science & Engineering, Inc. v. United States, 663 F.2d 82 (Ct. Cl. 1981), the Department of Health, Education and Welfare cancelled a three-year license agreement it had entered with the plaintiff, on the grounds that the license "was granted without authority and in violation of the Federal Procurement Regulations." Id. at 86. The plaintiff moved for summary judgment on liability, contending that the cancellation of the license was wrongful. Id. at 83. In response, the government argued that because the license was illegally granted, it was "a nullity" and the government therefore had "no liability for its cancellation." Id. at 87.

The court rejected the government's argument that the license agreement was "a nullity." Id. Citing Reiner, it observed that "[i]t is now settled law that this court will not declare a contract between the government and a private party void ab initio unless there was 'plain illegality' in the contract." Id. And not only had this standard not been met, the court concluded, but in fact the original decision to award the license agreement fell within the bounds of the discretion afforded to the agency under its regulations. Id. at 87–89. Thus, because the agency's decision to enter the license agreement was based on a permissible exercise of discretion and was not plainly illegal (or illegal at all), the court granted the plaintiff's motion for summary judgment as to liability, remanding the case to the trial court for a determination of damages. Id. at 89–90.

American Science is also of no assistance to Boeing. As in Amdahl and John Reiner, the plain and palpable illegality standard was discussed in the context of addressing whether a contract award was lawful, and whether, if it was not, the contract should be considered void ab initio. As noted above, this case does not involve a claim that a contract award was illegal. Further, the government does not assert that the ELC and ELS contracts were void ab initio. Instead, it contends that the payment provisions in those contracts are unenforceable as written because they are contrary to law. This case is thus controlled by the reasoning in Yosemite Park, Barrett Refining, and Urban Data Systems, and not the contract award cases.

Similarly, another case cited by Boeing in its reply fails to provide support for its argument. In Total Medical Management, Inc. v. United States, 104 F.3d 1314 (Fed. Cir. 1997), the plaintiff entered a renewable MOU with an Army Hospital in 1988 to provide internal medicine services at specified rates for beneficiaries of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). Id. at 1317. Congress amended the CHAMPUS law in 1989 to require that all charges by physicians and other individual providers be adjusted by the Medicare Economic Index (MEI). Id. This change was also reflected in newly issued regulations. Id. Subsequent and renewed MOUs between plaintiff and the Army did not, however, reflect the MEI limitation. See id. at 1317–18. Nonetheless, beginning in 1990, the Army (through its payment processer) applied the MEI limitation to reimbursements under those MOUs. Id. at 1318. The plaintiff therefore brought suit against the government in the Court of Federal Claims, arguing that the MOUs were not inconsistent with applicable law and seeking damages based on the difference between the rates specified in the MOUs and those it was actually paid. See id. The Court of Federal Claims granted plaintiff's motion for summary judgment as to liability. Id. at 1319.

The court of appeals reversed. Id. at 1320–21. It concluded that "at the time each of the [MOUs] was entered into (or renewed)," they were in "direct conflict" with the applicable

CHAMPUS regulations and that "the illegality was 'plain' under the Reiner test" because plaintiff "was on constructive and actual notice that the CHAMPUS regulatory scheme would be used in determining payment rates." Id. (quoting Reiner, 325 F.2d at 440). "Since the contracts were plainly illegal," the court of appeals concluded, "they were void ab initio." Id. at 1321 (quotation omitted). Accordingly, the court of appeals held that plaintiff's complaint should be dismissed for failure to state a claim. Id.

Total Medical is of no assistance to Boeing here because the decision did not address what relief, if any, would have been available to the plaintiff if the payment provision in the contract were found illegal, but not plainly and palpably so. Thus, in short, neither Total Medical nor any of the other decisions cited by Boeing hold that the government cannot successfully defend against a breach of contract claim based on illegality unless the illegality of the provision at issue is plain and palpable.

Finally, Boeing's reference to and reliance on the Winstar line of cases—which it claims presented "remarkably similar" facts—is fundamentally flawed. In those cases, the contracts at issue provided favorable accounting treatment to certain banks; Congress, through subsequent legislation, rendered that treatment unlawful. See United States v. Winstar Corp., 518 U.S. 839, 858 (1996) (plurality opinion). The Court held that notwithstanding the change in the law, the government was liable for breach of its agreement. Id. at 870.

Boeing observes that "[u]nder Winstar, the Government is liable for breaching its agreements even where Congress has changed the law to make them illegal." Pls.' Reply at 8. "[I]t necessarily follows," Boeing then asserts, "that the Government is liable for breaching its agreements where the Executive Branch unilaterally changes its own interpretation of regulations in an attempt to make them illegal." Id. Therefore, according to Boeing, Winstar "reinforces the heightened showing that the Government must make to avoid its express obligations on grounds of regulatory illegality." Id.

This line of reasoning suffers from multiple defects. For one, the fact that the government has changed its own view of the legality of the payment provisions at issue in this case is not what would "make them illegal" and therefore unenforceable. Their legality and enforceability is a matter for judicial determination and is not based on the government's views. Further, this case is not "remarkably similar" to Winstar; it is materially very different. In this case, the government's authority to agree to the payment provisions at the time it executed the relevant contracts is the matter in dispute. In Winstar, there was no question that the government had the authority to agree to the accounting treatment at issue at the time it entered the contract. The issue in Winstar was the effect of the subsequent change in law on the obligations imposed under that authorized agreement. Winstar, in short, does not assist Boeing's case.[28]

---

[28] In addition to vainly seeking support in Winstar, Boeing warns that if the plain and palpable standard is not applicable to cases like the present one, "the confidence that a contractor could have in its contracts with the Government" would be "radically undermine[d]." Pls.' Reply at 3. But as the Yosemite Park, Barrett Refining and Urban Data Systems decisions illustrate, the Court is not breaking new ground or upsetting settled expectations in ruling that where a payment provision in a government contract is illegal it will not be enforced. Further, as noted, a

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

For the reasons discussed above, the government is not required to prove the "plain and palpable illegality" of the payment provisions at issue in order to prevail on its defense to Boeing's breach of contract claim. The Court therefore turns to the question of whether—applying the appropriate standard—Boeing has shown the absence of a dispute as to whether the payment terms at issue in this case are not compliant with law, such that it is entitled to summary judgment.

### B.       To Be Allowable, Boeing's Accounting for the DSC and DPC Costs Was Required to Be GAAP-Compliant

Under FAR 31.201–2(a), "[a] cost is allowable only when [it] complies with" the "[s]tandards promulgated by the CAS Board, if applicable," or "otherwise, generally accepted accounting principles and practices appropriate to the circumstances," i.e., GAAP.[29] See id. § 31.201–2(a)(3). Further, costs must comply with "[a]ny [express] limitations set forth" in subpart 31.2. Id. § 31.201–2(a)(5). One of these express limitations, set forth in FAR 31.205–23, makes unallowable any "excess of costs over income under any other contract." Id.

---

contractor is not entirely without a remedy where a payment provision is ruled illegal. To the contrary, in appropriate cases, a contractor may be "entitled to reimbursement on a quantum valebant basis for the reasonable value in the marketplace of the supplies and concomitant services." Urban Data Sys., 699 F.2d at 1154; see also Barrett Ref., 242 F.3d at 1059–60; Yosemite Park, 582 F.2d. at 560. Whether or how that principle applies on the facts of this case has not been briefed by the parties and is not within the scope of the motion for summary judgment, which concerns liability on the contract.

[29] The term GAAP encompasses the corpus of "conventions, rules, and procedures that define accepted accounting practice at a particular point in time." See Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101 (1995) (quotation omitted). This body of guidance is "comprise[d of] a hierarchy of different sources." Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1374 n.17 (Fed. Cir. 2003); see also John Cibinic, Jr. et al., Cost-Reimbursement Contracting 539–40 (4th ed. 2014) [hereinafter Cost-Reimbursement Contracting]. At the top level of this hierarchy are "[e]stablished [a]ccounting [p]rinciples" set forth in "Financial Accounting Standards Board (FASB) Statements and Interpretations, Accounting Principles Board (APB) Opinions, and [American Institute of Certified Public Accountants (AICPA)] Accounting Research Bulletins." Rumsfeld, 315 F.3d at 1374 n.17 (quotation omitted); see also Cost-Reimbursement Contracting, supra, at 539–40 (same). The guidance that constitutes GAAP is not intended to "ensure identical accounting treatment of identical transactions," and generally "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management." Thor Power Tool Co. v. Comm'r, 439 U.S. 522, 544 (1979); see also id. at 542 (observing that "[t]he primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested" and that "the major responsibility of the accountant is to protect these parties from being misled"). Nevertheless, GAAP may "in some cases[] prescribe mandatory practices." Cost-Reimbursement Contracting, supra, at 539.

Here, the government asserts that whether Boeing complied with CAS 406 and FAR 31.205–23 turns on whether Boeing's lot accounting practice (from which the DSC and DPC costs were derived) complied with GAAP. See Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts I & II of Suppl. Compl. (Def.'s Mem.) at 14–36, ECF No. 125. The Court agrees.

**1.      CAS 406 Requires That a Contractor's Practice of Deferring Costs for Expensing in Later Cost Accounting Periods Be GAAP-Compliant**

The interpretation of a regulation (such as CAS 406) is a question of law, and begins with the plain meaning of the regulation's text. Lengerich v. Dep't of Interior, 454 F.3d 1367, 1370 (Fed. Cir. 2006) (citing Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414–15 (1945)); see also Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 204 (2011) (analysis of regulation's meaning begins with its text); Rumsfeld, 315 F.3d at 1369 ("[T]he interpretation of CAS . . . is an issue of law . . . ." (citing, inter alia, Rice v. Martin Marietta Corp., 13 F.3d 1563, 1568 (Fed. Cir. 1993))).[30]

CAS 406 addresses "the selection of the time periods to be used as cost accounting periods for contract cost estimating, accumulating, and reporting." See CAS 406–20. One of CAS 406's fundamental requirements[31] is that the contractor "follow consistent practices in his selection of the cost accounting period or periods in which any types of expense[s] . . . are accumulated and allocated." CAS 406–40(b). And in implementing this fundamental requirement, CAS 406's techniques for application state that "[t]he practices required" of the contractor "shall include appropriate practices for deferrals, accruals, and other adjustments to be used in identifying the cost accounting periods among which any types of expense and any types of adjustment to expense are distributed." CAS 406–50(b).

When read in combination, the plain import of these provisions is that when a contractor elects to "distribute[]" a cost to a later cost accounting period by deferring it, it must adopt an "appropriate practice for deferrals" to comply with CAS 406. Further, it is clear that the determination of whether a practice is "appropriate" under CAS 406–50(b) is based on whether

---

[30] While the interpretation of CAS involves a question of law, the court of appeals has also observed that "allegations of noncompliance with cost accounting standards normally raise questions of fact concerning the acts or omissions which allegedly constitute a violation of an applicable standard, upon which the Government bears the burden of proof." Raytheon, 747 F.3d at 1352 (quotation omitted).

[31] According to the independent CAS Board, which promulgates the CAS, the text of each standard includes a set of "Fundamental Requirement[s]," which supply "the broad principles or practices to be applied in accounting for the cost[s] covered by the Standard." See Statement of Objectives, Policies[,] and Concepts, 57 Fed. Reg. 31,036, 31,041 (July 13, 1992). Each standard then sets forth "Techniques for Application" of the fundamental requirement. Id. The described techniques specify "practices to be followed with respect to particular fundamental requirements or in particular circumstances." Id. Further, and of particular relevance to this case, the techniques for application serve to "narrow the accounting options in accordance with the concepts in the fundamental requirement." Id.

that practice is GAAP-compliant. In fact, the CAS Board itself has expressly linked the practices governed by CAS 406–50(b)—deferrals to later periods—to GAAP. Thus, the CAS Board's Statement of Objectives provides that, when "assign[ing] . . . the costs of resources consumed to time periods . . . . in order to recognize costs in periods other than those in which cash payment is made," "generally accepted accounting principles usually require deferral or accrual." See 57 Fed. Reg. at 31,037. Further, CAS 406 does not purport to define "appropriate practices"; and the Federal Circuit has held that "GAAP is an accepted supplement to CAS . . . where CAS itself does not decide [an] issue." Rumsfeld, 315 F.3d at 1373.

Accordingly, to comply with CAS 406, Boeing's practices for "deferrals, accruals, and other adjustments . . . in identifying the cost accounting periods among which any types of expense and any types of adjustment to expense are distributed" were required to be GAAP-compliant.

Notwithstanding the foregoing, Boeing contends that CAS 406 simply does not apply to the DSC payments because the CAS apply only to "cost accounting practices," and "[t]he payment of an agreed sum of costs . . . is . . . not itself a cost accounting practice." Pls.' Mem. at 24 (citing FAR 9903.302–1). This argument is based on a distortion of the language of FAR 9903.302–1. That regulation provides that "[t]he determination of the amount paid . . . for a unit of goods and services is not a cost accounting practice." Id. (emphasis added). It is obvious that "an agreed sum of costs" is not the same as "a unit of goods and services." And there is no question that the agreed-upon amounts of DSC resulted from the "measurement of cost[s]," nor that Boeing's deferral of the costs involved the "assignment of cost[s] to cost accounting periods," both of which are defined as cost accounting practices in FAR 9903.302–1.[32]

Mining a similar vein, Boeing asserts that the DSC payments are neither an "accumulation" nor an "allocation" of costs on the ELC contract under CAS 406. Pls.' Mem. at 24 (contending that the DSC costs "had already been accumulated, allocated, and inventoried before the ELC Contract was executed"); see also Pls.' Reply at 13–15. This argument does not cohere. As described above, when Boeing deferred its costs by placing them in inventory, it listed them as an asset on its books, not a liability or expense. And, after the commercial launch market collapsed, it apparently expected to record the costs as expenses in years covered by the ELC contract—i.e., as costs-of-sale for launches in those years.

CAS 406–40(b) and 406–50(b) contemplate precisely this sort of practice. See CAS 406–40(b) (contractor must "follow consistent practices in his selection of the cost accounting period or periods in which any types of expense . . . are accumulated and allocated" (emphasis added)); CAS 406–50(b) (requiring that the contractor's practices in this regard "include appropriate practices for deferrals, accruals, and other adjustments to be used in identifying the cost accounting periods among which . . . expense[s] and . . . adjustment[s] . . . are distributed" (emphasis added)). Thus, as contemplated by CAS 406, Boeing apparently deferred the expenses

---

[32] Even if Boeing's argument had merit and CAS 406 were inapplicable, FAR 31.201–2(a)(3) indicates that GAAP would still apply to the deferred costs. See id. (costs must comply with the "[s]tandards promulgated by the CAS Board, if applicable," or, "otherwise, generally accepted accounting principles and practices appropriate to the circumstances" (emphasis added)).

represented by the DSC costs and distributed them to the cost accounting periods covered by the ELC contract. It follows that to meet the requirements of CAS 406–50(b), Boeing had to employ "appropriate"—that is, GAAP-compliant—practices for those deferrals.

## 2. GAAP Determines Whether Claimed Costs Are Traceable to Losses on Other Contracts and Therefore Not Allowable Under FAR 31.205–23

As noted, FAR 31.205–23 makes unallowable any "excess of costs over income under any other contract." Id. "The theory behind th[is] cost principle is that each contract stands alone." Karen L. Manos, 1 Government Contract Costs & Pricing § 30:1 (2d ed. 2009) (observing that "the Government cannot use the contractor's profits on another contract to reduce its costs on the current contract" and that "the contractor cannot use losses experienced on another contract to justify a higher price").

Boeing does not appear to dispute the government's contention that whether the deferred costs constitute losses on other contracts is determined by reference to GAAP. See Def.'s Mem. at 34; Pls.' Reply at 15–16. Rather, it posits that the government was permitted to pay the DSC costs even if they constituted losses on other contracts because the government agreed to pay those costs via fixed-price CLINs.[33] See Pls.' Mem. at 36 n.17; Pls.' Reply at 15–16. Boeing bases this argument on FAR 31.102, which provides that when the FAR's cost principles apply "in the pricing of fixed-price contracts," the government's objective is to "negotiate prices that are fair and reasonable, cost and other factors considered." See Pls.' Reply at 15.

Boeing's argument lacks merit. Under the circumstances presented here, where cost was essentially the sole factor in determining price, it would not be "fair and reasonable" for a CO, when considering "cost and other factors," to simply ignore the fact that the relevant costs were, in fact, losses on other contracts. The existence of FAR 31.205–23 confirms that this is so, as that provision represents a determination that, as a matter of policy, losses on other contracts generally are not allowable. See Boeing N.A., Inc. v. Roche, 298 F.3d 1274, 1281 (Fed. Cir. 2002) ("The concept of allowability is addressed to the question whether a particular item of cost should be recoverable as a matter of public policy." (quotation omitted)). Accepting Boeing's argument would permit FAR 31.102 to simply override that policy judgment where an agency wished to compensate a contractor for losses on other contracts via a fixed-price mechanism.

Further, despite the fixed-price label, Boeing consistently describes the DSC payments as intended to "reimburse" it for the costs it incurred prior to December 2006. See Pls.' Mem. at 4 (asserting that the question in this case is "[w]hether the Government can avoid its contractual agreements to reimburse ULS for [DSC] and [DPC]"); see also id. at 1, 3, 12–14, 19, 23–24, 26, 35, 37; Pls.' SUMF ¶¶ 71, 99. This choice of language shows that Boeing itself understood the government's agreement to pay DSC as akin to reimbursement on a cost-type contract, rather

---

[33] As the government points out, the Air Force conditioned its promise to negotiate and pay the DPC costs on the outcome of a DCAA audit into the allocability and allowability of those costs. See Def.'s Mem. at 39 (citing PA 2627). And as described above, that audit found that Boeing's DPC proposal was non-compliant with CAS 406. See PA 3921. Accordingly, Boeing's argument on this point goes only to DSC.

than a pure fixed-price arrangement. And that understanding is also consistent with the plain meaning of the interrelated Lot Accounting and DSC advance agreements, upon which Boeing relies to establish the extent of the government's contractual obligation to pay DSC. See Pls.' SUMF ¶ 114 (Lot Accounting advance agreement stating that "as of the date [of the agreement], the [CO] has found Lot Accounting a compliant practice," and that "[t]his determination is not intended to and does not prevent the revocation, withdrawal, or other reconsideration of this determination if subsequent facts indicate that some aspect of this . . . practice is noncompliant with CAS or FAR"); id. ¶ 104 (DSC advance agreement setting forth an amount that "represents costs" derived from lot accounting, and stating that the DSC payments would "compensate the contractor for such unreimbursed expenses on a separate line item").

Accordingly, the Court rejects Boeing's argument that FAR 31.205–23 is irrelevant to whether the DSC costs were payable under the ELC contract. Lot accounting's GAAP-compliance is therefore material to determining whether Boeing's deferred costs constituted losses on other contracts.

### C.   Boeing's GAAP Compliance is Genuinely Disputed

The court of appeals has indicated that whether a contractor's accounting practices comply with GAAP generally presents a factual question. See Rumsfeld, 315 F.3d at 1369 n.6 (observing that "as to the requirements of GAAP," a factfinder "could properly consider expert testimony"). As discussed above, multiple factual questions exist regarding Boeing's compliance with GAAP between 1998 and 2006, and in particular its compliance with AICPA's Statement of Position (SOP) 81-1. A non-exhaustive list of these disputes, discussed in greater detail below, includes (1) whether, for purposes of deferring costs via average-cost accounting, SOP 81-1 permits the combination of existing and anticipated production-type contracts; (2) if it does, whether Boeing's lot accounting method (which undisputedly combined existing and anticipated contracts) nevertheless constituted program accounting, which is outside the scope of SOP 81-1; and (3) if it did not, whether Boeing otherwise failed to comply with GAAP in the course of holding the deferred costs in inventory. Accordingly, summary judgment in Boeing's favor is not proper at this juncture.

### 1.   Combining Production-Type Contracts Under ¶ 38

First, factual disputes exist regarding whether Boeing's lot accounting practice was a permissible accounting practice under SOP 81-1. That SOP sets forth accounting standards for what are known as "production-type" contracts.[34]

Under SOP 81-1, production-type contracts are "binding agreements between buyers and sellers in which the seller agrees, for compensation, to perform a service to the buyer's specifications." PA 109 ¶ 12. Production-type contracts are generally complex and "long-term" in nature, and may "consist of legally enforceable agreements in any form." Id. at 108–09 ¶¶ 11–12. Examples include contracts for projects such as "the development and production of military

---

[34] Boeing's expert asserts that SOP 81-1 is "Category (b)" guidance in the GAAP hierarchy, meaning it is the second-most authoritative type of guidance. See PA 4406–07.

and commercial aircraft, weapons delivery systems, space exploration hardware, and computer software." Id. at 106 ¶ 1; see also id. at 109 ¶ 13.

The "[b]asic [a]ccounting [i]ssue" SOP 81-1 addresses with respect to production-type contracts is "[t]he determination of the point or points at which revenue should be recognized as earned and costs should be recognized as expenses." Id. at 106 ¶ 2. Production-type contracts warrant separate guidance on this point because the contractor must "measur[e] the results of relatively long-term events and allocat[e] those results to relatively short-term accounting periods." Id. Accounting for production-type contracts is thus "complicated by the need to evaluate continually the uncertainties inherent in the performance of contracts and by the need to rely on estimates of revenues, costs, and the extent of progress toward completion." Id.

Paragraphs 35–38 of SOP 81-1 specify the circumstances under which production-type contracts may be combined for accounting purposes. See id. at 116–17. Of particular relevance here, ¶ 38 provides that production-type contracts (or segments of such contracts) may "be combined into groupings such as production lots or releases for the purpose of accumulating and allocating production costs to units produced or delivered on the basis of average unit costs," so long as (1) "[t]he contracts are with one or more customers for the production of substantially identical units of a basic item produced concurrently or sequentially," and (2) "[r]evenue on the contracts is recognized on the units-of-delivery basis of applying the percentage-of-completion method."[35] Id. at 117.

One dispute in this case concerns whether combining existing and anticipated contracts for launch services, as was done under Boeing's lot accounting practice, was appropriate under ¶ 38. Notably, although SOP 81-1 specifically discusses "anticipated" contracts elsewhere (i.e., at ¶¶ 14, 73, 74, and 75), it does not mention them in ¶ 38. The parties draw differing conclusions about the import of that drafting choice. See Def.'s Mem. at 16–17; Pls.' Reply at 17–18. Thus, the government's expert opines that anticipated contracts may not be combined with existing contracts under ¶ 38. PA 4635–36; 4686–95. Boeing's experts reach the opposite conclusion. Id. at 4428–30; 4560–63. The existence of this dispute precludes summary judgment, for the Court cannot resolve it without hearing and weighing the expert testimony.

### 2.    Program Accounting

Further, even if it is appropriate under ¶ 38 to combine anticipated and existing production-type contracts, the question remains whether combining those two types of contracts suggests that Boeing was actually employing "program accounting," which is expressly excluded from SOP 81-1's coverage. Id. at 109–10 ¶ 14. Thus, ¶ 14 of SOP 81-1 states that the SOP does not cover "[c]ontracts included in a program and accounted for under the program method of accounting." Id. at 109. And it further explains that "[f]or accounting purposes, a program consists of a specified number of units of a basic product expected to be produced over a long

---

[35] Under the SOP, contractors may elect one of two acceptable means of accounting for production-type contracts—the "Percentage of Completion Method" and the "Completed-Contract Method." See PA 111–12 ¶ 22; id. at 115 ¶ 30. The "units of delivery" method is a variation on the percentage of completion method. See id. at 111–12 ¶ 22.

period in a continuing production effort under a series of existing and anticipated contracts." Id. at 109–10.

The Court notes that AICPA's Guide for Audits of Federal Government Contractors (Audit Guide) states that "[i]n practice, the program method of accounting has had very limited applications, such as in major commercial aircraft production sold to commercial (or, in some cases, commercial and government) customers." See DA 1383 ¶ 3.59. This is so "because of (a) the significant uncertainties associated with making reasonably dependable estimates of the total number of units to be produced and sold, (b) the length of time to produce and sell them, and (c) the associated production costs and selling prices." Id. Further, the Audit Guide points out, "[t]he unique aspects of the government procurement process make estimating the market and timing of deliveries extremely difficult" and place other restrictions on the contractor. Id. ¶¶ 3.60 to .61. "Therefore," the guide concludes, "the program method of accounting is not appropriate for government contracts or subcontracts except as provided in paragraph 3.59"— i.e., in the context of major commercial aircraft production. Id. ¶ 3.61.

Here, the record is replete with evidence that some individuals involved with Boeing's lot accounting practice either considered it to be program accounting or expressed concern that it deviated from ¶ 38's prescriptions for combining contracts. See, e.g., id. at 1558 (internal Boeing draft explanation of Lot 1 titled "Lot-Costing/Program-Accounting," which states that Boeing "decided to use the program accounting method for the Delta IV product line" and that "[t]he program accounting method is not new to Boeing"); id. at 913 (internal Boeing email stating that "lot accounting, in my opinion, is very similar to program accounting"); id. at 914 (internal Boeing email stating that "[d]eferred costs is a concept that is usual for program accounting situations, but not for lot accounting situations"); id. at 1108 (letter from ULA's controller stating that "[l]ot accounting is considered 'program accounting'"); cf. PA 2643 (ULA description of lot accounting observing that "[t]he Production Lot Accounting methodology is rooted in aircraft manufacturing where high factory throughput and low cost differential between manufactured units describes the production landscape," and that "[a] similar production landscape was forecasted within the Launch Vehicle industry in 1999," but failed to materialize).

Thus, even assuming that ¶ 38 permits combining anticipated and existing contracts, determining whether the manner in which Boeing combined existing and anticipated contracts constituted program accounting, rather than a permissible combination under ¶ 38, also presents a disputed question of fact making this case unsuitable for disposition by summary judgment.[36]

### 3.   Holding the Deferred Costs in Inventory

Finally, genuine factual disputes exist regarding whether Boeing's lot accounting practice complied with the applicable GAAP directives that govern when deferred costs may be held in inventory. These directives include (1) Chapter 4 of Accounting Research Bulletin (ARB) 143, which describes the procedures that generally apply when accounting for inventory, see PA 153–

---

[36] One of Boeing's experts implicitly acknowledges the existence of this dispute. See PA 4467 (opining that he disagreed with the government's expert's analysis "for the simple reason that Boeing was not applying program accounting on the Delta IV program").

58; (2) Statement of Financial Accounting Standards (SFAS) No. 5, which provides additional guidance on such accounting, see id. at 191; and (3) portions of SOP 81-1—specifically, ¶¶ 69–75 and ¶¶ 85–89—which discuss these principles in the context of production-type contracts, see id. at 126–28, 132–33.

As relevant here, ¶ 8 of ARB 43 states that "in accounting for inventories, a loss should be recognized whenever the utility of goods is impaired by damage, deterioration, obsolescence, changes in price levels, or other causes." Id. at 156. This rule is applied because, under such circumstances, stating the inventory's value at cost may not reflect "the amount properly chargeable against the revenues of future periods." Id. Further, ¶ 8 provides that "a loss of utility is to be reflected as a charge against the revenues of the period in which it occurs." Id.

SFAS No. 5 provides further guidance on when a company must recognize the impairment of an asset, such as inventory, under circumstances that "involv[e] uncertainty as to possible . . . loss." Id. at 191 ¶ 1. In particular, ¶ 8 states that "[a]n estimated loss . . . shall be accrued by a charge to income" when "[i]nformation . . . indicates that it is probable that an asset ha[s] been impaired," meaning that "it [is] probable that one or more future events will occur confirming the fact of the loss."[37] Id. at 192–93. And as to inventories specifically, the statement observes that "impairment is recognized . . . when the utility of inventory is no longer as great as its cost." Id. at 207 ¶ 75 (emphasis omitted).

Thus, as the parties agree, ARB 43 and SFAS No. 5 dictate that, in general, a loss should be recognized when costs held in inventory are not "probable of recovery." See Def.'s Mem. at 24; PA 4428 (Boeing's expert opining that "GAAP allows a company to carry costs in inventory . . . so long as it reasonably determines that their recovery is probable").

Finally, in the context of production-type contracts in particular, ¶ 72(g) of SOP 81-1 observes that "[i]nventoriable costs should not be carried at amounts that when added to the estimated cost to complete are greater than the estimated realizable value of the related contracts." Id. at 127. Paragraphs 73–75 of SOP 81-1 further describe circumstances in which certain types of pre-contract costs may be deferred if their recovery is probable. See id. at 127–28. And ¶ 88 of SOP 81-1 states that when the "estimated cost for the contract exceeds estimated revenue," a "provision for loss arises." Id. at 132. Such a provision "should be made in the period in which [it] become[s] evident." Id. ¶ 85.

Here, disputes exist regarding whether Boeing's deferral of costs via lot accounting complied with the requirement that costs not be held in inventory if they are not probable of recovery. As described, the relevant GAAP directives provide that costs may no longer be deferred and held in inventory if they are no longer probable of recovery—that is, once it has become probable that the inventoried costs exceed the future revenues chargeable to the inventory.

---

[37] For a loss to accrue, "[t]he amount of loss" must also "be reasonably estima[ble]." See PA 192–93.

Assessing recoverability at any given point therefore involves examining both probable future revenues and probable future costs. Here, as noted above, Lot 1's exhaustion date stretched far beyond Boeing's initial assumptions, upsetting its expectations about Lot 1's per-mission production costs. See, e.g., Pls.' SUMF ¶¶ 17–18 (asserting that by July 2003, Boeing realized that "[a]s a result of the changes in [its] manifest assumptions, the estimated cost of each anticipated launch increased significantly"); PA 1752 (2006 DCAA report observing that the long time period covered by the lot "put[] the government at a greater [cost] risk because of the wide variability of [labor] costs included in the average price" for any particular mission). And for recovery to remain probable given high per-mission costs, revenues for missions needed to be correspondingly high. See, e.g., PA 868–70 (2003 document prepared by Boeing titled "Delta IV Re-Pricing and Anticipated Future Revenues as of Second Quarter 2003" discussing possible mechanisms for increasing mission prices); id. at 1556–57 (2006 document prepared by Boeing's outside auditor discussing Boeing's expectation that "the government will pay substantially more for future launches").

The record before the Court raises (but does not answer to the Court's satisfaction) a number of questions about whether Boeing's accounting decisions in this regard complied with GAAP. Many (but by no means all) of these questions center on the time period from mid-2003 to 2006. For instance, documents from mid-2003 indicate that Boeing had begun to assume that the anticipated (but unordered) launches required to consume Lot 1's end items would nearly all consist of government launches, and that its revenues on those launches would equal or exceed its costs. See, e.g., id. at 860 ("[T]he new strategy adopted in 2Q03 is to focus Delta IV on serving the US Government customer"); id. at 861 (observing that "[i]n 1Q03 Boeing alerted the USAF to the risk of very significant price increases on existing . . . contracts and future bids"); id. at 874–75 (stating that Boeing "assumed that the government will be willing to pay for a higher price for rockets in order to retain its goal of assured access to space" and that Boeing's "position is to not sell these rockets below their cost"). At the time, Boeing stated that it had "24 firm and priced option launch services currently on contract." Id. at 869.

By 2006, however, the number of "definitized" missions had seemingly dwindled from 24 to 14, placing up to 10 additional missions in the category of "anticipated." See id. at 900 (2Q 2004 pricing review stating that Boeing had 19 definitized contracts); id. at 1556 (outside auditor analysis reporting that "[a]s of 3/31/06, the program has 18 firm ordered Delta IV launches"); id. at 4426 (opinion of Boeing's expert stating that "14 Delta IV missions . . . had been ordered as of 2006"); id. at 4570 (same). The explanation for this discrepancy is not apparent to the Court, but the change clearly shifted a substantial amount of deferred costs to the anticipated contracts.[38] And as to those anticipated contracts, the record reflects that Boeing itself expressed uncertainty about whether future government launch funding would be sufficient to cover its costs. See, e.g., DA 714 (2003 document stating "[a]llocated funds not sufficient" for "sustain[ing] 2 EELV providers"). Further, as discussed, the government's acquisition strategy for the ELC and ELS

---

[38] As previously noted, the Air Force transferred seven ordered launches from Boeing to Lockheed Martin sometime after mid-2003 based on the results of its PIA investigation, but it is unclear whether that partially accounts for the diminishing number of definitized missions, or whether Boeing re-characterized those particular missions as "anticipated" rather than "definitized."

contracts stated that it would not reimburse the contractors for losses on previous contracts. Thus, whether it was probable between 2003 and 2006 that Boeing could recover all the deferred costs it had allocated to anticipated contracts in a future where the government was its only customer presents a disputed factual question.

Similar questions, and others, also exist regarding whether Boeing complied with ¶¶ 73–75 of SOP 81-1, which (as noted) establish rules governing whether certain types of pre-contract costs may be deferred for later recognition. Thus, at ¶ 73, the SOP identifies several categories of pre-contract costs, including (among others), "learning, start-up, or mobilization costs incurred for anticipated but unidentified contracts." PA 127. The SOP flags "[l]earning [and] start-up costs" for particular attention, as "[a] direct relationship between such costs and the anticipated future contracts is often difficult to establish, and the receipt of future contracts often cannot reasonably be anticipated." Id. at 127–28 ¶ 74.

Finally, at ¶ 75, the SOP prescribes differing treatments for the different types of pre-contract costs set forth in ¶ 73. See id. at 128. In particular, ¶ 75(d) specifies that "[l]earning or start-up costs incurred in connection with existing contracts and in anticipation of follow-on or future contracts for the same goods or services should be charged to existing contracts." Id. (emphasis added).

Here, the parties dispute whether the deferred costs at issue in this case include learning or start-up costs within the meaning of ¶¶ 73–75, which (as the SOP makes clear) may not be deferred and charged to anticipated contracts. See id. at 4438–39 (Boeing's expert opining that the deferred costs did not include learning or start-up costs as that term is used in ¶¶ 73–75); id. at 4706–07 (government's expert disputing this claim). This dispute is factual in nature, and thus also precludes the entry of summary judgment in this case.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

At bottom, the record reveals that Boeing's lot accounting mechanism was notably complex even at the outset of the Delta IV program. That complexity was only amplified when shifting currents in the space launch market upended Boeing's expectations about who would pay for launch services and how long it would take to exhaust Lot 1. Given these unique and complex circumstances (which the sheer volume of the record reflects), it is unsurprising that disputes of fact exist regarding lot accounting's compliance with GAAP, including, but not limited to, the disputes described above. And because lot accounting's GAAP compliance is material to the allowability of the DSC and DPC costs, and thus to whether the government breached the ELC and ELS contracts by refusing to pay them, Boeing's motion for summary judgment must be **DENIED**.

**CONCLUSION**

For the reasons discussed above, Boeing's motion for summary judgment is **DENIED**. The parties shall submit a joint status report by **September 28, 2018**, proposing further proceedings in the case.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge